**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

_____

DOMINIC OLIVEIRA,                    )
on his own behalf and on behalf of   )
all others similarly situated,       )
                                     )
              Plaintiffs,            )        Civil Action No. 1:15-cv-10603-PBS
v.                                   )
                                     )
NEW PRIME INC.,                      )
                                     )
              Defendant.             )
_____    )

**PLAINTIFFS' ASSENTED-TO MOTION FOR
<u>PRELIMINARY SETTLEMENT APPROVAL</u>**

This case has been brought on behalf of truck drivers for Defendant New Prime,

Inc. ("Prime").  Plaintiff Dominic Oliveira alleges that Prime has failed to compensate its

drivers properly for classroom orientation and for driving (both when classified as

employees and when classified as independent contractors) and that Prime's pay

practices violate the Fair Labor Standards Act ("FLSA") and, for classroom orientation

occurring in Missouri, the Missouri minimum wage laws and common law.  After more

than five years of litigation, including trips to the United States Court of Appeals for the

First Circuit and the United States Supreme Court relating to the applicability of

Prime's arbitration agreement to drivers classified as independent contractors, extensive

discovery, full briefing and argument on class and collective certification and

Defendant's motion to compel arbitration under Missouri law, and months of arm's

length negotiations with a mediator, the parties have reached a proposed settlement.

Specifically, the parties propose to resolve this case, as well as the related case <u>Haworth</u>

et al. v. New Prime, Inc., W.D. Mo. Civil Action No. 6:19-cv-03025-RK, now pending in

the United States District Court for the Western District of Missouri, on a class and

collective action basis pursuant to Federal Rule of Civil Procedure 23(e) and 29 U.S.C. §

216(b), on behalf of the following class and collective:

> All individuals who have attended training to become truck drivers for
> Prime and/or have driven for Prime either as employee drivers or as
> independent contractor drivers who have leased their trucks through
> Prime at any time from October 2, 2012, to May 8, 2020, and all individuals
> who have otherwise attended training in Missouri to become truck drivers
> for Prime at any time from March 4, 2010, to May 8, 2020, except two
> individuals who served as named plaintiffs in another class settlement
> against New Prime, Inc., in the case of Montgomery v. New Prime, Inc.,
> C.D. Cal. Civil Action No. 8:17-cv-00321, and signed full releases as part of
> that settlement.

The parties have agreed to settle this matter on behalf of the proposed class/collective

for up to $28,000,000, as well as significant non-monetary relief, as described in further

detail in Section I.A, *infra*.  A copy of the parties' Settlement Agreement is attached as

Exhibit 1.

This proposed settlement is a fair, reasonable, and adequate result for the Class,

as discussed in more detail below.  In addition to affording each settlement class

member significant monetary and non-monetary recovery for the claims in this case, it

will avoid the risks, uncertainties, and delays inherent in further litigation.

Accordingly, Plaintiffs respectfully ask that the Court:

1.      Preliminarily certify the proposed class/collective for settlement purposes;

2.      Approve the notice procedure and authorize Plaintiffs to issue notice and

claim forms to the settlement class members in the forms attached as Exhibit 2-A

(electronic) and Exhibit 2-B (paper);

3.      Approve the distribution formula and claim procedure set forth in the parties' Settlement Agreement and this motion;

4.      Order that, once the <u>Haworth</u> court has preliminarily approved the settlement on behalf of the B/C seat class, this Court shall preside over the consolidation of the two cases for purposes of final settlement approval; and

5.      Schedule a final fairness and approval hearing for a date in approximately October 2020, at which time Plaintiffs will report to the Court the results of the notice process and explain why this settlement should be given final approval and the settlement fund distributed.

A proposed preliminary settlement approval order is attached as Exhibit 3.

## BACKGROUND

Plaintiffs filed this lawsuit on March 4, 2015, alleging that Prime has failed to compensate its truck drivers as required by the FLSA and, as to classroom orientation in Missouri, as required by the Missouri minimum wage laws and common law.  Prime moved to compel arbitration of Plaintiff Oliveira's claims.  In October 2015, this Court denied Prime's motion to compel arbitration without prejudice and ordered the parties to conduct factual discovery on the preliminary question of Plaintiff's status as an employee or an independent contractor (for purposes of determining whether the Federal Arbitration Act's exemption for "contracts of employment" of workers in interstate commerce, 9 U.S.C. § 1, applied).  Prime immediately filed a Notice of Appeal, pursuant to the FAA's provision allowing interlocutory appeal of orders denying motions to compel arbitration, 9 U.S.C. § 16.  This case was stayed pending appeal.

The First Circuit issued a decision in Plaintiff's favor on May 12, 2017, affirming this Court's decision and holding that Prime's arbitration agreement was not covered by the FAA.  857 F.3d 7 (1st Cir. 2017).  Prime then sought certiorari before the United States Supreme Court.  While Prime's petition for certiorari was pending, the parties engaged in some discovery.  The Supreme Court granted Prime's petition on September 6, 2017.  This matter was then stayed pending the Supreme Court's decision.  The Supreme Court issued a decision affirming the First Circuit on January 15, 2019.

Once the case was remanded from the Supreme Court, the parties undertook extensive discovery.  Prime produced approximately 50,000 pages of written discovery.  Plaintiffs conducted a Rule 30(b)(6) deposition, two other depositions of Prime managerial employees, and a site inspection of Prime's corporate headquarters in Springfield, Missouri.  Prime conducted the deposition of named plaintiff Dominic Oliveira.  Plaintiff Oliveira and the other opt-in Plaintiffs also responded to written discovery requests and produced documents in discovery.

The parties also engaged in substantive motion practice after remand from the Supreme Court.  Prime moved to compel arbitration of the claims of individuals who had filed opt-in consent forms which was fully briefed and argued and which motion the Court denied on December 9, 2019.  Plaintiffs filed a motion for class and collective certification, for which opposition and reply briefs were also filed, and the Court heard oral argument on that motion on December 18, 2019.  There was also discovery motion practice, which was referred to Magistrate Judge Donald L. Cabell and as to which the parties negotiated a resolution.

On January 22, 2019, Rocky Haworth filed an action styled <u>Haworth et al. v. New</u> <u>Prime, Inc.</u>, W.D. Mo. Civil Action No. 6:19-cv-03025-RK, in the United States District Court for the Western District of Missouri, on behalf of himself and similarly situated individuals who drove for Prime as B seat and C seat drivers and alleged that Prime had failed to pay those drivers at least minimum wage for all hours worked. The case included counts under the FLSA and the Missouri minimum wage laws and common law.

The <u>Haworth</u> case was heavily litigated, including written discovery and depositions and the production of millions of lines of electronic data pertaining to the Class members. Plaintiffs filed a motion for conditional certification under the FLSA which was fully briefed. Prime filed a motion to stay the case because the <u>Oliveira</u> case was pending. At that point, the undersigned counsel joined as counsel in <u>Haworth</u>. The <u>Haworth</u> court heard argument on Plaintiffs' motion for conditional certification and Prime's motion to stay proceedings and ultimately granted Plaintiffs' motion for conditional certification and denied Prime's request for a stay on March 23, 2020. <u>See</u> <u>Haworth v. New Prime, Inc.</u>, __ F. Supp. 3d__, 2020 WL 1430478 (W.D. Mo. Mar. 23, 2020). After that, the parties engaged in motion practice regarding the method of sending notice to potential opt-in plaintiffs. Pursuant to the parties' settlement agreement, the parties notified the <u>Haworth</u> court of a proposed settlement. Pending deadlines in <u>Haworth</u> have been stayed, and a preliminary settlement approval hearing (at which time Plaintiffs will request that <u>Haworth</u> be transferred to this Court and

consolidated with this case for final settlement approval purposes) is to be scheduled in early August 2020.

While these cases were being litigated, the parties also were engaging in ongoing settlement negotiations. The parties engaged in a full-day mediation with mediator D. Charles Stohler on November 14, 2020. Prior to that mediation, Prime turned over extensive data from which Plaintiffs were able to conduct calculations of potential damages. The parties also engaged in data production for settlement purposes and a full-day mediation in the Haworth matter. The matters did not settle at mediation, but Mr. Stohler continued to conduct settlement negotiations over the course of several months, including exchange of data, damages calculations, etc. Finally, with Mr. Stohler's assistance, the parties have reached an agreement to settle this case pursuant to the terms set forth herein. The proposed settlement includes resolution of both this matter and the Haworth matter and consolidation of both cases after preliminary approval before this Court for final settlement approval.[1]

## BACKGROUND

I.   **THE PROPOSED SETTLEMENT TERMS, PLAN FOR NOTICE, AND DISTRIBUTION OF THE SETTLEMENT FUND.**

A.   **Settlement terms and proposed distribution of settlement funds.**

The total settlement fund is up to $28,000,000, of which $14,000,000 is non-reversionary, meaning it will all be distributed, and $14,000,000 is to be distributed only

---

[1]      Pursuant to the terms of the Settlement Agreement, if the settlement is finally approved, this Court shall dismiss the consolidated actions with prejudice as part of final settlement approval. If the settlement is not finally approved, this Court shall transfer *Haworth* back to the United States District Court for the Western District of Missouri for further proceedings.

to the extent that it is claimed.  Per the Settlement terms  the following allocation is to be made among the various claims in the case:

- **Classroom orientation fund**:  $7,000,0000 in non-reversionary funds to resolve the claims relating to unpaid classroom orientation;

- **B/C seat driving fund**:  $3,500,000 in non-reversionary funds and $5,000,000 in claims-made funds to resolve the claims relating to B seat or C seat driving;

- **A seat driving fund**:  $3,500,000 in non-reversionary funds and  $5,000,000 in claims-made funds to resolve the claims relating to employee A seat (post final/upgrade orientation) driving; and

- **Independent contractor driving fund**:  $4,000,000 in claims-made funds to resolve the claims relating to independent contractor driving (*i.e.*, driving while classified as an independent contractor).

Additionally, per the terms of the Settlement Agreement:  up to 33% of the total settlement fund as attorneys' fees to Plaintiffs' counsel (up to $9,240,000 total); incentive payments of up to $50,000 for named plaintiff Dominic Oliveira and up to $25,000 for Rocky Haworth, the named plaintiff in the <u>Haworth</u> case, to be drawn equally ($25,000 each) from the classroom orientation fund, the non-reversionary portion of the B/C seat driving fund, and the non-reversionary portion of the A seat driving fund; reasonable litigation costs, including costs of settlement administration, of up to $225,000, to be drawn half (up to $112,500) from the classroom orientation fund, 25% (up to $56,250) from the non-reversionary portion of the B/C seat driving fund, and 25% (up to $56,250) from the non-reversionary portion of the A seat driving fund; and a fund of up

to $200,000 to resolve disputes and pay reasonable late claims to be drawn 25% (up to $50,000) from the claims-made portion of the B/C seat driving fund, 25% (up to $50,000) from the non-reversionary portion of the A seat driving fund, and 50% (up to $100,000) from the independent contractor driving fund.  If the Court were to reduce any amounts proposed for attorneys' fees, incentive payments, litigation costs, or the dispute fund, those amounts would be distributed to class members to the extent that they come from non-reversionary funds and would revert to Defendant to the extent that they come from claims-made funds.

The amounts above are to be distributed to class/collective members as follows:

**Minimum payments**:  Minimum payments of $100 each would be distributed all class/collective members, regardless of whether or not they submit Consent to Join Forms.  These amounts will be paid out from the non-reversionary funds in proportion to the individual class/collective member's entitlement to receive funds from each of the non-reversionary funds.

**Orientation fund**:  Individuals' shares from the orientation fund shall be distributed proportionate to their attendance at orientation, except that different orientations shall be assigned different weights or shares, specifically 2 shares for attending D seat orientation since March 2012, and 1 share for D seat orientation attended in Missouri before March 2012, 1 share for individuals who have worked as A seat drivers or independent contractor drivers (and who therefore attended a classroom orientation in connection therewith), and 1.25 shares for individuals who have worked as both A seat drivers and independent contractor drivers.  Additionally, there shall be a 1.5 multiplier

for each D seat orientation attended in Missouri since March 2012.  The shares are in recognition of the differing damages available for each orientation (because of varying lengths of orientation), and the multipliers are in recognition of the higher Missouri minimum wage and the fact that the pre-March 2012 claims are based on common law theories only, for which the potential damages are lower.  All amounts from the orientation fund shall be distributed to claiming class members in proportion to their relative shares from the fund.

**B and C seat driving funds**:  Individuals' shares from the B and C seat driving funds shall be distributed proportional to each individual's total number of weeks worked as a B and/or C seat driver multiplied by the number of miles driven as a B and/or C seat driver and divided by gross earnings while employed as a B and/or C seat driver.  This formula takes into account length of employment as a B and/or C seat driver, miles driven/hours worked, and wages earned.  All amounts from the non-reversionary portion of the B and C seat driving fund shall be distributed to claiming class members in proportion to their relative shares from the fund.  Amounts from claims-made portion of the B and C seat driving fund shall be distributed to the extent that they are claimed.

**A seat driving funds**:  Individuals' shares from the A seat driving funds shall be distributed proportional to each individual's total number of weeks worked as an A seat employee driver multiplied by the number of miles driven as an A seat driver and divided by gross earnings while employed as an A seat driver.  This formula takes into account length of employment as an A seat driver, miles driven/hours worked, and

wages earned.  All amounts from the non-reversionary portion of the A seat driving fund shall be distributed to claiming class members in proportion to their relative shares from the fund.  Amounts from the claims-made portion of the A seat driving fund shall be distributed to the extent that they are claimed.

**Independent contractor driving fund**:  Individuals' shares from the independent contractor driving fund shall be distributed proportional to each individual's total number of weeks worked as an independent contractor driver multiplied by the number of miles driven as an independent contractor driver and divided by gross earnings minus 50% of deductions taken while employed as an independent contractor driver.  This formula takes into account length of employment as an independent contractor driver, miles driven/hours worked, wages earned, and allegedly unlawful deductions taken from pay.  Amounts from the independent contractor driving fund shall be distributed to the extent that they are claimed.

Individuals who participated as class members in the class settlement in Montgomery v. New Prime, Inc., C.D. Cal. Civil Action No. 8:17-cv-00321 shall be entitled to receive 50% of what would be their total settlement share in this case if they had not participated in that settlement; accordingly, their resulting numerators and/or settlement shares will be decreased by 50%.  Any amounts not distributed to Montgomery plaintiffs and/or class members from this settlement shall be proportionally redistributed to other eligible class members.

Claiming class/collective members will be entitled to receive amounts from all funds that apply to them and shall also receive the $100 minimum payment.

For more explanation of the formulas for calculating individuals' shares from each fund, *see* Settlement Agreement (Exhibit 1), Section C.

Plaintiffs' proposed allocation formula is fair, reasonable, and adequate in that it takes into account each individual's potential damages from the case and allocates the settlement monies accordingly.  Courts routinely hold that such formulas are fair, reasonable, and adequate.  Indeed, a distribution formula that reimburses class members based on the type and extent of their injuries is presumptively reasonable. See, e.g., Sullivan v. DB Investments, Inc., 667 F.3d 273, 328 (3d Cir. 2011) ("Courts generally consider plans of allocation that reimburse class members based on the type and extent of their injuries to be reasonable") (citations omitted); Walsh v. Popular, Inc., 839 F. Supp. 2d 476, 482 (D.P.R. 2012) (approving methodology for calculating shares from class settlement based on "each class member's losses relative to those of the class as a whole"); Hochstadt v. Bos. Sci. Corp., 708 F. Supp. 2d 95, 110 (D. Mass. 2010) (holding that plan of allocation was reasonable because it was based on class members' losses); In re Omnivision Technologies, Inc., 559 F. Supp. 2d 1036, 1045 (N.D. Cal. 2008) ("It is reasonable to allocate the settlement funds to class members based on the extent of their injuries"); In re Citric Acid Antitrust Litigation, 145 F. Supp. 2d 1152, 1154 (N.D. Cal. 2001) (allocation plan that "reimburses class members based on the type and extent of their injuries is generally reasonable").

Prime shall deposit $21,000,000 into a Qualified Settlement Fund established by the Settlement Administrator[2] within sixty days after the Court grants preliminary

---

[2]     The parties have agreed to use JND Class Action Administration as the Settlement Administrator in this case.

settlement approval.  Prime shall deposit any remaining amounts owed within thirty days after the close of the claim period.  Settlement payments shall be made by check within thirty days after final approval of the settlement (including exhaustion of appeals, if any).  Individuals shall have 180 days to deposit or cash checks from the settlement.  After the expiration of the checks, the Settlement Administrator shall deliver any uncashed or uncollected but claimed funds to the appropriate state Unclaimed Property Division. Reversionary funds not allocated to claiming Class Members shall be returned to Defendant.

In addition to these monetary amounts, members of the class/collective are receiving significant non-monetary relief.  Specifically, Prime has agreed to a release of monies that it asserts that employee drivers owe to Prime and has agreed not to seek those monies from the drivers in post-employment collection efforts (including both internal collection efforts, wage deductions, and collection efforts by third-party collection companies).  Prime has agreed to discontinue these collections as to all monies that Prime asserts are owed to it by employee drivers in the class/collective, regardless of whether or not they submit claim forms to participate in the settlement.

Prime has also agreed to a release of monies that it asserts that independent contractor drivers owe to Prime and has agreed not to seek those monies from the drivers in post-employment collection efforts (including both internal collection efforts, wage deductions, and collection efforts by third-party collection companies), with two conditions.  First, this release only applies to independent contractor drivers who submit claim forms to participate in the settlement.  Second, the release only applies as

to independent contractor drivers who have not destroyed, damaged, or stolen Prime's property.  The parties have agreed to an extensive process for determining whether or not Prime claims that a driver has destroyed, damaged, or stolen Prime's property, including an opportunity to cure and an opportunity for the driver to challenge Prime's assertion, which challenge shall be decided by the Settlement Administrator in the first instance and ultimately, if the challenge is not capable of resolution by the Settlement Administrator, by binding arbitration before D. Charles Stohler, whose fees for these services shall be paid out of the dispute fund.  If a dispute is resolved in whole or in part in favor of the driver, then Prime shall release entitlement to monies as to such driver (in whole or in part, depending on the resolution of the dispute).

For all individuals for whom Prime has agreed to release entitlement to monies (described above), Prime has also agreed to the following upon final approval of the settlement:

- After final approval of the settlement, Prime will use its best efforts to request that the national credit reporting agencies (Experian, Equifax and TransUnion delete any reporting of the trade line(s) with respect to the drivers' accounts with Prime in connection with the purported debts released;

- If a driver requests by letter to HireRight that records of a default to Prime and/or related entities be corrected in accordance with the release of Prime's entitlement to monies, and to the fullest extent permitted by law, Prime agrees to provide a timely letter to HireRight with a copy to the requesting driver that any

defaults owing to Prime and/or related entities have been rescinded by mutual
agreement; and

- Prime and related entities shall give no new or additional negative references to
  any driver for having allegedly defaulted on any amounts released.

   **B.     Settlement notice and claim process.**

If this Court, as well as the Haworth Court, preliminarily approve this
settlement, Plaintiffs will send the attached notice and claim form to members of the
proposed class/collective.  The parties have agreed to notice being sent by email to all
individuals for whom Prime has email addresses and by first-class mail (with return
envelope provided) for all individuals for whom Prime does not have email addresses
and/or as to whom the emails are returned as undeliverable.  The Settlement
Administrator shall make all reasonable efforts to follow up on undeliverable addresses
and to resend the notice and claim form to updated addresses (including all addresses
provided by Plaintiffs' counsel and/or class members).  The Settlement Administrator
shall establish a website with the notice, contact information for the Settlement
Administrator and Plaintiffs' counsel, and the claim form which may be submitted
electronically (*inter alia*).  A reminder shall go out approximately halfway through the
claim period to those who have not claimed.  The reminder shall go out by email to
those with valid email addresses and by a postcard by first-class mail for others.  The
reminder shall include the address of the website, as well as contact information for the
Settlement Administrator and Plaintiffs' counsel.

Class/collective members shall have sixty days from initial mailing to submit claim forms, object, or request exclusion from the settlement, except that those deadlines shall be extended for those whose original notice packet is resent because of undeliverable addresses so that the individuals have no less than thirty days to submit a claim form, object, or request exclusion.  Class/collective members may submit claim forms electronically (using electronic signature) via the class settlement website and may also submit claim forms by mail (including FedEx, UPS, etc.), email, or facsimile, sent or postmarked by the claim deadline.

The proposed notice constitutes sufficient class notice.  "Notice is satisfactory 'if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.'"  Nat'l Ass'n of Deaf v. Massachusetts Inst. of Tech., No. 3:15-CV-30024-KAR, 2020 WL 1495903, at *4 (D. Mass. Mar. 27, 2020) (approving notice which "includes a clear and comprehensive summary of the provisions of the proposed settlement," "defines the relevant terms, explains what content will be captioned, when the captioning will occur, and 'explains to class members their right to object and be heard in open court'"); Wallace v. Powell, 288 F.R.D. 347, 367 (M.D. Pa. 2012) (adequate class settlement notice "detailed the nature of the action, the definition of [the classes], the claims of the Settlement Classes, the terms of the Settlement Agreement, and the right to object or request exclusion from the terms of the Settlement").  Substantively, the notice clearly informs settlement class/collective members about the terms of the settlement, their options with respect to the settlement, the monetary and non-monetary relief to which they are entitled if they participate, the

release of claims, relevant deadlines and dates, and contact information for the Settlement Administrator and Plaintiffs' counsel.  The settlement agreement will also be available on the settlement website.

The plan for dissemination of the notice is reasonable as well.  Notice will be sent to class/collective members by email or by mail for those for whom Prime does not have email addresses or for whom emails are returned as undeliverable and will also be available on the settlement website.  A reminder will be sent by mail and/or email as well to those who have not yet claimed approximately halfway through the claim period.  Class/collective members are able to submit claim forms electronically or by mail, fax, or email.  This notice and method for submission of claim forms is unquestionably reasonable and the best practicable, particularly for a population of truck drivers who are often away from home but usually have frequent access to email.

Indeed, courts routinely approve notice dissemination plans similar to this one. See Romero v. Clean Harbors Surface Rentals USA, Inc., 368 F. Supp. 3d 152, 163 (D. Mass. 2019) ("[T]he Court agrees with Romero that email notice is appropriate in this case because it is likely to be more effective than alternative methods."); Graham v. Hall's S. Kitchens, LLC, No. 2:18-CV-02621-RMG, 2018 WL 6177971, at *2 (D.S.C. Nov. 27, 2018) ("[T]he Court finds that notice via email is appropriate in today's mobile society."); see also In re Solodyn (Minocycline Hydrochloride) Antitrust Litig., 2017 WL 5710424, at *1 (D. Mass. Nov. 27, 2017) (approving notice to individual class members by first-class mail plus posting notice on settlement website); In re Asacol Antitrust Litig., 2017 WL 4118967, at *3-4 (D. Mass. Sept. 14, 2017) (same).

For the reasons set forth above, Plaintiffs' proposed notice and plan for dissemination of notice and submission of claim forms are fair, reasonable, and adequate and should be preliminarily approved.

### C.      Releases of claims.

As part of the settlement (and subject to its approval by the Courts), Dominic Oliveira, Rocky Haworth, and Defendant will execute general, mutual releases in favor of each other. All class and collective members shall release state and federal unpaid wage claims, contract and quasi-contract claims, and any other claims related to unpaid wages or compensation that were or could have been brought in the Oliveira and/or Haworth cases to the fullest extent allowed by law. All persons who opt out of the settlement will not release any claims. The notice to class/collective members informs them that, unless they opt out, they are subject to a release of state and federal unpaid wage claims, contract and quasi-contract claims, and any other claims related to unpaid wages or compensation that were or could have been brought in the Oliveira and/or Haworth cases to the fullest extent allowed by law.  The notice also separately informs class/collective members that individuals who opt out will not be bound by the release. As part of the notice and claim form, collective/class members are reminded again of their release of claims.  As to those who receive only the $100 minimum payment, checks issued pursuant to this settlement agreement will further contain the language of this release.

## II.     THE COURT SHOULD GRANT PRELIMINARY APPROVAL OF THIS SETTLEMENT.

### A.     The Court should certify the proposed settlement class/collective pursuant to Federal Rule of Civil Procedure 23(b)(3) and 29 U.S.C. § 216(b).

For settlement purposes, and as required by Rule 23(e), the proposed settlement class/collective meets the requirements of Rule 23(a) and Rule 23(b)(3) for certification. Plaintiffs incorporate by reference their motion for class and collective action certification and reply brief in support of the motion, Dkt. Nos. 198, 199, 216, which explain in detail why the proposed class/collective meets the requirements for certification.  Significantly, the settlement class/collective is substantially similar to the class and collective for which Plaintiffs originally sought certification.  Specifically, Plaintiffs sought FLSA collective certification of the following collective:  "All individuals who have attended training to become truck drivers for Prime and/or have driven for Prime either as employee drivers or as independent contractor drivers who have leased their trucks through Prime at any time since October 2, 2012."  Dkt. No. 198 at 1.  They sought Rule 23 certification of the following class:  "All individuals who have attended training in Missouri to become truck drivers for Prime at any time since March 4, 2010."  *Id*.

The individuals in the proposed class/collective are similarly situated workers who have suffered the same alleged violation of their wage rights, namely the failure to pay workers at least minimum wage for all hours worked.  Moreover, the class is numerous, comprised of over 40,000 individuals.  Notably, this Court has already granted class and collective certification on nearly identical claims.  In <u>Montoya v. CRST</u>

Expedited, Inc., the Court granted class and collective certification on claims for unpaid

orientation and failure to pay truck drivers at least minimum wage for driving time

(because of the mileage-based pay system, allegedly unlawful deductions from wages,

and failure to compensate drivers for time in the sleeper berth in excess of eight hours

per day).  311 F. Supp. 3d 411 (D. Mass. 2018).  Also, significantly, the Haworth court

has already granted conditional FLSA certification for some of the claims in this case,

holding that individuals who had driven for Prime as B and C seat drivers were

similarly situated with respect to their claims that they were not properly compensated

for all hours worked under the FLSA.  Haworth, 2020 WL 1430478.

This Court and other courts in this District have also granted class or collective

certification in numerous unpaid wages claims on behalf of truck drivers who had been

classified as independent contractors.  See, e.g., Ouadani v. Dynamex Operations E.,

LLC, No. CV 16-12036-PBS, 2019 WL 4384061, at *7 (D. Mass. Sept. 13, 2019) (granting

class certification on delivery drivers' claims for independent contractor

misclassification and unpaid wages, because the  central question is "[w]hether or not

the . . . Drivers were properly classified as independent contractors rather than

employees," and Plaintiffs' evidence about common policies and practices suffices to

ensure that this determination may be made on a classwide basis); Romero v. Clean

Harbors Surface Rentals USA, Inc., 368 F. Supp. 3d 152, 156 (D. Mass. 2019) (granting

FLSA classification based on the plaintiffs' allegations that:  "Clean Harbors directed his

rate of pay; he reported directly to Clean Harbors, which coordinated his work and set

his schedule; Clean Harbors dictated his work locations; he was required to follow

Clean Harbors' policies and procedures; and Clean Harbors prohibited him from working for other employers or subcontracting his work for Clean Harbors"); DaSilva v. Border Transfer of MA, Inc., 296 F. Supp. 3d 389, 400 (D. Mass. 2017) ("Examining the standard terms [of the contract] to determine the extent of Border Transfer's contractual control is an exercise that appears to lead to common answers."); Vargas v. Spirit Delivery & Distribution Services, Inc., 245 F. Supp. 3d 268, 282 (D. Mass. 2017) (common issues predominated in independent contractor misclassification claim on behalf of delivery drivers, where "answers to [] inquiries [about liability] should be readily ascertainable through a common source—Spirit's corporate records").

For the reasons set forth in Plaintiffs' motion for class certification and reply brief in support of the motion, and as held in the cases cited above, this case is appropriately certified as a class and collective action for settlement purposes.

> **B.    The proposed settlement is fair, reasonable, and adequate.**

It is well-established that courts prefer settlements of lawsuits over continued litigation.  See, e.g., In re: Google Inc. Cookie Placement Consumer Privacy Litig., 934 F.3d 316, 326 (3d Cir. 2019) ("[W]e favor the parties reaching an amicable agreement and avoiding protracted litigation.").  "[S]ettlements spare the judicial system and the litigants the expense and time associated with the full panoply of pretrial, trial and post trial proceedings.'"  Vermont Pure Holdings, Ltd. v. Berry, 23 Mass. L. Rptr. 33, 2010 WL 1665258, *11 (Mass. Super. 2010), quoting 2 McLaughlin on Class Actions § 6:3. Moreover, "[c]ourts have consistently noted that the public interest favoring the settlement of litigation is even stronger in the context of class action litigation, where

one proceeding can resolve many thousands or even millions of claims that might otherwise threaten to swamp the judiciary.'" Id.

A class action may not be compromised without court approval, and the court must decide whether the settlement is "fair, reasonable, and adequate." See Fed. R. Civ. P. 23(e); see also In re Relafen Antitrust Litig., 360 F. Supp. 2d 166, 195 (D. Mass. 2005). At the preliminary approval stage, the court applies a "less rigorous standard" and "need only determine whether the settlement 'appears to fall within the range of possible final approval.'" Sesto v. Prospect CharterCARE, LLC, No. CV 18-328 WES, 2019 WL 2394251, at *1 (D.R.I. June 6, 2019);  In re JPMorgan Chase Mortg. Modification Litig., No. 1:11-MD-02290-RGS, 2014 WL 2205493, at *1 (D. Mass. May 28, 2014) (preliminarily approving settlement "as being fair, reasonable, and adequate, and within the range of possible approval").

"A settlement is presumed to be reasonable when it is achieved by arm's length negotiations conducted by experienced counsel." Nat'l Ass'n of Deaf, 2020 WL 1495903, at *4.  Moreover, when the following "procedural guidelines have been followed," there is a "presumption that the settlement is within the range of reasonableness":  "'(1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected.'"  In re M3 Power Razor System Marketing & Sales Practice Litig., 270 F.R.D. 45, 62-63 (D. Mass. 2010) (quoting In re Lupron Mktg. and Sales Prac. Litig., 345 F. Supp. 2d 135, 137 (D. Mass. 2004)).

Each of these elements is satisfied here.[3]  First, the proposed settlement resulted from extensive arms' length negotiations that occurred over the course of several months, and which included extensive data production and analysis and a full-day mediation and numerous follow-up conversations facilitated by an experienced mediator.[4]

Second, substantial litigation and discovery has taken place.  *See* Background section, *supra*, which describes the litigation and negotiation history in detail.  Thus, all parties were familiar with the factual record underlying the claims in this case.

Third, the parties' attorneys are experienced in this type of litigation.  Plaintiffs' lead counsel Hillary Schwab and Rachel Smit of Fair Work, P.C. have extensive experience litigating and settling wage class actions.  Indeed, they focus their practice exclusively on wage and employment matters, and they have been appointed class counsel in several wage cases.  See, e.g., Montoya, 311 F. Supp. 3d at 424 (holding that undersigned counsel satisfied adequacy element for class certification); Dvornikov v. Landry's Inc., No. 15-CV-13286-ADB, 2017 WL 1217110, at *10 (D. Mass. Mar. 31, 2017) ("Plaintiffs' counsel [including Hillary Schwab as lead counsel] is clearly qualified, experienced, and able to undertake this litigation."); Chebotnikov v. LimoLink, Inc., No. CV 14-13475-FDS, 2017 WL 2909808, at *2 (D. Mass. July 6, 2017) ("[P]laintiffs' chosen lead counsel, Hillary Schwab, appears to be a qualified and experienced attorney in the

---

[3]     Because notice has not yet gone out, the fourth factor – number of objectors – is irrelevant.  To the extent that any class member objects to this settlement after receiving notice, Plaintiffs will address that objection in their final settlement approval briefing.

[4]     The parties in Haworth also engaged in another full-day mediation with a different experienced mediator, although that did not result in settlement..

areas of employment law and class action litigation.").  They are experienced in this area of the law and have used the knowledge derived from that experience to achieve a fair and reasonable result for the settlement class.

Counsel in the <u>Haworth</u> case are similarly experienced in wage and hour class action litigation, and other types of class actions, and their expertise contributed to the negotiated resolution of this case.  Garrett M. Hodes, with the Hodes Law Firm, LLC, has over twenty years' experience representing plaintiffs in class actions in mortgage lending and consumer protection matters, insurance coverage disputes, products liability and toxic tort matters, and wage and hour matters. He has been appointed as class counsel in several actions and multidistrict proceedings in Kansas and Missouri state and federal courts, and the United States District Court for the Western District of Pennsylvania, on behalf of classes ranging in size from less than twenty to over 14 million, and has been involved in dozens of class action settlements, a class action jury trial, a 13-day class arbitration, and numerous appeals.[5]

Virginia Stevens Crimmins and Matthew Crimmins of the Crimmins Law Firm, LLC also have extensive experience in class and collective action employment litigation and a history of the successful prosecution of such claims.  Ms. Crimmins has had an emphasis in her career in complex and nationwide employment litigation, including for example acting as co-lead counsel in nationwide class and collective actions related to

---

[5]     <u>See, e.g.</u>, <u>Hopkins v. Kansas Teachers Cmty. Credit Union</u>, 265 F.R.D. 483, 487 (W.D. Mo. 2010); <u>Landrum v. Meadows Credit Union</u>, 08-441-CV-W-DW, 2012 WL 12957387, at *1 (W.D. Mo. Mar. 16, 2012); <u>In re Cmty. Bank of N. Virginia Mortg. Lending Practices Litig.</u>, 03CV0425, 2013 WL 3972458, at *8 (W.D. Pa. July 31, 2013), <u>aff'd</u>, 795 F.3d 380 (3d Cir. 2015).

employment matters, such as the Bank of America MDL wage and hour litigation, In re: Bank of Am. Wage & Hour Employment Practices Litig., 706 F. Supp. 2d 1369 (U.S. Jud. Pan. Mult. Lit. 2010).  Mr. Crimmins has had a similar emphasis in complex and class litigation since beginning his practice at a large defense firm and has extensive experience in the prosecution and settlement of class and collective wage and hour litigation.  Mr. and Mrs. Crimmins have been appointed as counsel for class or collective actions in employment cases on many occasions, by numerous courts.[6]  The experience of the Hodes Law Firm and the Crimmins Law Firm in the areas of class and collective actions and employment litigation assisted in obtaining the fair and reasonable result for the settlement class.

Plaintiffs' counsel take very seriously their obligation and duty to unnamed settlement class members and will agree to a settlement only when they are convinced that it is in the best interest of the settlement class.  In this case as well, the named plaintiffs have been committed to obtaining a fair resolution of the case for their fellow settlement class members as well as themselves, and has supported Plaintiffs' counsel's commitment to negotiating on behalf of the interest of the entire class.

---

[6]     See, e.g., Kafka v. Melting Pot Restaurants, Inc., No. 4:17-cv-00683-HFS, 2019 WL 718830 (W.D. Mo. Jan. 9, 2019); Sylvester v. Wintrust Fin. Corp., No. 12 C 01899, 2013 WL 5433593 (N.D. Ill. Sept. 30, 2013); Rottman v. Old Second Bancorp., Inc., 735 F.Supp.2d 988 (N.D. Ill. Aug. 25, 2010); Perry v. Nat'l City Mortg., Inc., No. 05-CV-891 DRH, 2007 WL 1810472 (S.D. Ill. June 21, 2007); Gieseke v. First Horizon Home Loan Corp., 408 F. Supp. 2d (W.D. Mo. Jan. 10, 2006); Gieseke v. First Horizon Home Loan Corp., 408 F. Supp. 2d 1164 (D. Kan. 2006); Davis v. NovaStar Mortg., Inc., 408 F. Supp. 2d 811 (W.D. Mo. 2005).

**C.      The proposed incentive awards are fair and reasonable.**

In their motion for final settlement approval, Plaintiffs will also request that the Court approve an incentive award of $50,000 for named plaintiff Dominic Oliveira and $25,000 for Rocky Haworth, the named plaintiff in the <u>Haworth</u> case.  These proposed incentive awards are fair and reasonable, given that it was the named plaintiffs who not only initiated this lawsuit on behalf of their coworkers, but who obtained this recovery. The named plaintiffs were vital to the prosecution of this matter.  Not only did Dominic Oliveira participate in discovery, including responding to written discovery and sitting for a full day deposition, but he assisted counsel strategically in the case and served an important role as class representative throughout the case's journey to the United States Supreme Court and back.  Public Justice awarded Dominic Oliveira its 2019 Change Maker Award for his work as named plaintiff in this case.  Mr. Oliveira's role as spokesperson and champion for the rights of workers during this case's five-year history was invaluable.  Rocky Haworth also participated in written discovery, a full day deposition in Iowa and an all-day mediation in Kansas City, Missouri, and helped counsel prepare several Declarations throughout the course of the <u>Haworth</u> proceedings and assisted in the final settlement negotiations. His participation in the <u>Haworth</u> matter was vital to protecting the interests of the B and C seat drivers, and the Class as a whole.

Courts have widely recognized that efforts such as those undertaken by Mr. Oliveira and Mr. Haworth are deserving of incentive awards, which serve an important function in promoting enforcement of state and federal law by private individuals while

encouraging class settlements.  See In re Relafen Antitrust Litig., 231 F.R.D. 52, 82 (D.

Mass. 2005) ("Incentive awards are recognized as serving an important function in

promoting class action settlements, particularly where as here, the named plaintiffs

participated actively in the litigation"), quoting In re Lupron, 228 F.R.D. 75, 98 (D. Mass.

2005).[7]  "Service awards [aka incentive payments] are common in class action cases and

serve to compensate plaintiffs for the time and effort expended in assisting the

prosecution of the litigation, the risks incurred by becoming and continuing as a

litigant, and any other burdens sustained by the plaintiffs. . .  It is important to

compensate plaintiffs for the time they spend and the risks they take."  Beckman v.

KeyBank, N.A., 85 Fed. R. Serv. 3d 593 (S.D.N.Y. Apr. 29, 2013).

The incentive payments requested here are well within the range of those

approved in other class actions and are less than 0.3% of the total monetary recovery

available to the Class.  See, e.g., In re Asacol Antitrust Litig., 2017 WL 11475275, at *4 (D.

Mass. Dec. 7, 2017) (approving service awards of $100,000 each for five named

plaintiffs); In re Flonase Antitrust Litig., 951 F. Supp. 2d at 751 (awarding incentive

awards of $50,000 and $40,000); Brotherton v. Cleveland, 141 F. Supp. 2d 907, 914 (S.D.

Ohio 2001) (awarding $50,000 incentive payment to named plaintiff who "has been

---

[7]      See also, e.g., In re Compact Disc Min. Adver. Price Antitrust Litig., 292 F. Supp. 2d 184, 189 (D.
Me. 2003) ("Because a named plaintiff is an essential ingredient of any class action, an incentive award
can be appropriate to encourage or induce an individual to participate in the suit"); Savett, et al.,
"Consumer Class Actions: Class Certification Issues, Including Ethical Considerations and Counsel Fees
and Incentive Payments to Named Plaintiffs," 936 PLI / Corp. 321, 340 ("It has become commonplace for
the named representatives to request a special payment for having borne the flag and headed a class
action.  Most courts are receptive to this because they feel that private attorneys general should be
encouraged, and such incentives further the goals of federal and state laws"); Sheppard v. Consol. Edison
Co. of New York, Inc., 2002 WL 2003206, at *5-6 (E.D.N.Y. 2002) (collecting cases approving incentive
payments).

instrumental in bringing this lawsuit forward" and "has performed numerous tasks in association with this litigation"); McCoy v. Health Net, Inc., 569 F. Supp. 2d 448, 479–80 (D.N.J. 2008) (awarding $60,000 incentive awards to each named plaintiff where "the Class Representatives spent a significant amount of their own time . . . litigating these cases for the benefit of the absent members of the settlement class. . .").

Indeed, in other wage and hour class actions in the trucking industry, courts have awarded incentive payments in the range requested here.  In Van Dusen v. Swift Transportation Co., the court awarded "Service Awards to Named Plaintiffs in the amount of $50,000 per Named Plaintiff as the reasonable value of the services provided by each of the Named Plaintiffs to the Class Members in litigating and resolving this Action."  D. Ariz. Civil Action No. 2:10-cv-00899, Dkt. No. 1158.  In Browne v. P.A.M. Transport, Inc., the court has granted preliminary approval of the parties' proposed settlement, including $50,000 incentive payments for each of three named plaintiffs (for a total of $150,000).  W.D. Ark. Civil Action No. 5:16-cv-5366, Dkt. Nos. 279, 282.

Plaintiffs' requested incentive payments are appropriate, and Plaintiffs respectfully request that they be preliminarily approved.

## III.   THE REQUESTED ATTORNEYS' FEES AWARD IS FAIR AND REASONABLE, AND SUPPORTED BY APPLICABLE PRECEDENT.

In the motion for final settlement approval, Plaintiffs will also request that the Court approve distribution of a 33% share of the settlement proceeds (up to $9,240,000, up to half of which would come from reversionary funds) to Plaintiffs' counsel for attorneys' fees, as well as up to $225,000 in litigation costs, including the costs of settlement administration.  The proposed settlement notice informs the settlement class

members that Plaintiffs' counsel will request up to 33% of the settlement proceeds as

attorneys' fees.

Courts generally favor an award of fees from a common fund, as called for by the

proposed settlement in this case.  As the Supreme Court has explained:

> [T]his Court has recognized consistently that a litigant or a lawyer who
> recovers a common fund for the benefit of persons other than himself or
> his client is entitled to a reasonable attorneys' fee from the fund as a
> whole. . . .  Jurisdiction over the fund involved in the litigation allows a
> Court to prevent . . . inequity by assessing attorney's fees against the
> entire fund, thus spreading fees proportionately among those benefited by
> the suit.

Boeing Co. v. Van Gemert, 444 U.S. 472, 478 (1980) (citations omitted).  See also Blum v.

Stenson, 465 U.S 886, 900 n.16 (1984); In re Thirteen Appeals, 56 F.3d 295 (1st Cir. 1995)

(awarding attorneys' fees of $68 million out of a $220 million settlement fund).

When awarding fees from a common fund, the "percentage of the fund" method

is preferred over the lodestar method.  As the First Circuit observed, the percentage

method is less burdensome to administer than the lodestar method.  In re Thirteen

Appeals, 56 F.3d at 307.  The court also endorsed the percentage method because it is

result-oriented, and therefore promotes a more efficient use of attorney time – a loadstar

method may give attorneys an incentive to spend as many hours as possible on the

litigation and may discourage early settlements.  Id.  When using the percentage

method, courts routinely approve fee awards that represent approximately one-third of

the settlement fund.[8]

---

[8]     There are numerous examples of cases in which a one-third fee was approved, including:
Wilensky v. Digital Equipment Corp., C.A. No. 94-10752-JLT (D. Mass. July 11, 2001); Chalverus v.
Pegasystems, Inc., C.A. No. 97-12570-WGY (December 19, 2000) (awarding as an attorneys' fee one-third
of a more than $5 million recovery); In re Peritus Software Services, Inc. Sec. Litig., C.A. No. 98-10578-

An award of 33 percent of the fund is consistent with the vital role that

contingency arrangements play in making legal counsel available to individuals who

cannot afford hourly fees. Unlike traditional firms that receive hourly fees on a monthly

basis, employment counsel who take cases on contingency often spend years litigating

cases (typically while incurring significant out-of-pocket expenses for experts,

transcripts, travel, etc.), without receiving any ongoing payment for their work.

Sometimes fees and expenses are recovered; other times, despite hundreds of hours of

work, nothing is recovered. This type of practice is viable only if attorneys, having

received nothing for their work on some cases, receive more in other cases than they

would if they charged hourly fees. Courts have long recognized this reality. See, e.g.,

Hensley v. Eckerhart, 461 U.S. 424, 448 (1983) (noting that "[a]ttorneys who take cases

on contingency, thus deferring payment of their fees until the case has ended and

taking upon themselves the risk that they will receive no payment at all, generally

receive far more in winning cases than they would if they charged an hourly rate"); In

re Union Carbide Corp. Consumer Products Business Securities Litig., 724 F. Supp. 160,

168 (S.D.N.Y. 1989) ("Contingent fee arrangements implicitly recognize the risk factor in

litigation and that the winning cases must help pay for the losing ones if a lawyer who

represents impecunious plaintiffs, or those plaintiffs not so fully committed as to put

their own money where their mouth is, will remain solvent and available to serve the

---

WGY (D. Mass. Feb. 28, 2000); Zeid v. Open Environment Corp., C.A. No. 96-12466-EFH (D. Mass. June 24, 1999) (awarding a fee of one-third of a $6 million settlement); In re Picturetel Corp. Sec. Litig., C.A. No. 97-12135-DPW (D. Mass. Nov. 4, 1999) (approving award of one-third of a $12 million settlement fund); Morton v. Kurzweil Applied Intelligence, Inc., C.A. No. 10829-REK (D. Mass. Feb. 4, 1998); In re Copley Pharmaceutical, Inc. Sec. Litig., C.A. No. 94-11897-WGY (D. Mass. Feb. 8, 1996) (awarding one-third of a $6.3 million settlement fund); In re Gillette Securities Litig., C. A. No. 88-1858-REK (D. Mass. Mar. 30, 1994).

public interest."). Contingency fee arrangements not only make access to the judiciary feasible for most private individuals, it also incentivizes parties to discuss settlement early, thus unburdening the trial courts. See Frank v. Eastman Kodak Co., 228 F.R.D. 174, 188 (W.D.N.Y. 2005) (contingency fees "directly align[] the interests of the class and its counsel and provide[] a powerful incentive for the efficient prosecution and early resolution of litigation").

By permitting clients to obtain attorneys without having to pay hourly fees, the contingency fee system provides critical access to the courts for people who otherwise would not be able to find competent counsel to represent them. That access is particularly important for the effective enforcement of public protection statutes, such as the wage laws at issue in this case. It is well recognized that "private suits provide a significant supplement to the limited resources available to [government enforcement agencies] for enforcing [public protection] laws and deterring violations." Reiter v. Sonotone Corp., 442 U.S. 330, 344 (1979).

In this case, Plaintiffs' counsel have expended extensive time and resources. The case has been fought heavily over more than five years, including an appeal to the First Circuit, a fully briefed petition for certiorari to the United States Supreme Court, and ultimately full briefing and argument to the Supreme Court. Moreover, the case was not simply settled after the Supreme Court's decision in Plaintiffs' favor on the arbitration issue. The parties continued to litigate extensively over another year and a half, including full-blown discovery, as well as substantive briefing and argument on class and collective certification and Prime's motion to compel arbitration under

Missouri law, etc.  The <u>Haworth</u> case was hard-fought as well, with thorough discovery, and briefing, argument, and decisions favorable to Plaintiffs on Plaintiffs' motion for conditional certification under the FLSA and Defendant's motion for a stay of the case, and with Defendant's withdrawal of its motion to compel arbitration after briefing.

Moreover, in support of their final fee petition in their motion for final settlement approval, Plaintiffs intend to submit information about their lodestar rates, so that the Court may perform a lodestar crosscheck.

Accordingly, Plaintiffs respectfully request that the Court preliminarily approve Plaintiffs' request for attorneys' fees.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that this Court grant preliminary approval of the settlement and the proposed plan of distribution as fair, reasonable, and adequate, and authorize Plaintiffs to send the proposed notice of settlement and claim form to the settlement class.  Specifically, Plaintiffs request that the Court issue a preliminary approval order in the form attached to this motion as Exhibit 3.

Respectfully submitted,

DOMINIC OLIVEIRA,
on behalf of himself
and all others similarly situated,

By their attorneys,

 _/s/ Hillary Schwab_____
Hillary Schwab (BBO #666029)
Brant Casavant (BBO #672614)
Rachel Smit (BBO #688294)
FAIR WORK, P.C.
192 South Street, Suite 450
Boston, MA 02111
Tel. (617) 607-3261
Fax. (617) 488-2261
hillary@fairworklaw.com
brant@fairworklaw.com
rachel@fairworklaw.com

Andrew Schmidt, Esq.
        Admitted _pro hac vice_
Andrew Schmidt, PLLC
97 India St.
Portland, ME 040101
Tel. (207) 619-0320
Fax. (207) 221-1029
Andy@MaineWorkerJustice.com

Dated:  July 20, 2020

**CERTIFICATE OF SERVICE**

I hereby certify that on July 20, 2020, I electronically filed the foregoing with the

Clerk of the Court by using the CM/ECF system which will send a notice of electronic

filing to all counsel of record.

                                           */s/ Hillary Schwab*
                                           Hillary Schwab