**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

_____

|  |  |  |
|---|---|---|
| DOMINIC OLIVEIRA, | ) | |
| on his own behalf and on behalf of | ) | |
| all others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 1:15-cv-10603-PBS |
| v. | ) | |
| | ) | |
| NEW PRIME INC., | ) | |
| | ) | |
| Defendant. | ) | |
|_____| ) | |
| | ) | |
| ROCKY L. HAWORTH, | ) | |
| on his own behalf and on behalf of | ) | |
| all others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 1:20-cv-11584-PBS |
| v. | ) | |
| | ) | |
| NEW PRIME INC., | ) | |
| | ) | |
| Defendant. | ) | |
|_____| ) | |

**PLAINTIFFS' ASSENTED-TO MOTION FOR FINAL SETTLEMENT APPROVAL**
**AND MEMORANDUM IN SUPPORT THEREOF**

After more than five years of litigation, including appeals to the First Circuit and

the United States Supreme Court, the parties have reached a comprehensive settlement

that affords substantial recovery to over 40,000 class members, including significant

monetary and non-monetary relief.  As of the date of the filing of this motion, 14,689

valid claim forms have been submitted, 54 individuals have requested exclusion from

the settlement, and only one class member has filed an objection.  Based on the claim

forms filed to date, after distribution of $100 minimum payments and amounts from

non-reversionary and reversionary funds, over 73% of the settlement fund is being distributed to class members.  As set forth below in detail, the settlement is fair, reasonable, and adequate and should be approved.

Plaintiffs request that this Court grant final approval of the class action settlement in this case.  Specifically, Plaintiffs request that the Court:

1.      Certify the following Settlement Class pursuant to Federal Rule of Civil Procedure 23(b)(3) and 29 U.S.C. § 216(b):  All individuals who have attended training to become truck drivers for Prime and/or have driven for Prime either as employee drivers or as independent contractor drivers who have leased their trucks through Prime at any time from October 2, 2012, to May 8, 2020, and all individuals who have otherwise attended training in Missouri to become truck drivers for Defendant New Prime, Inc. at any time from March 4, 2010, to May 8, 2020, except for the named plaintiffs in *Montgomery v. New Prime, Inc.*, Civil Action No. 8:17-cv-00321 (C.D. Cal.);

2.      Hold that the settlement is fair, reasonable, and adequate;

3.      Hold that the notice provided to Settlement Class Members was the best notice practicable and fully satisfied the requirements of the Federal Rules of Civil Procedure, due process, and any other applicable laws;

4.      Approve the proposed distribution of settlement funds as set forth herein;

5.      Overrule the objection filed at Docket No. 273, and deny the "Motion to Appeal," and the related "Request for Waiver of Mandatory Fee Reduction," and motion to proceed *in forma pauperis* filed at Docket Nos. 274 and 275;

6.      Grant Class Counsel's petition for attorneys' fees and costs (see ECF Dkt. No. 272);

7.      Approve the requested incentive awards for Plaintiff Dominic Oliveira and Plaintiff Rocky Haworth;

8.      Order that the payments be made in this matter pursuant to the timetable established in the parties' Settlement Agreement; and

9.      Enter judgment pursuant to Federal Rule of Civil Procedure 54(b) and 29 U.S.C. § 216(b) et seq. and dismiss with prejudice all claims released as part of this settlement.

A proposed Final Settlement Approval Order and Judgment is attached as Exhibit 1.

This motion provides background about the claims, describes the notice process and the results thereof, describes the proposed distribution of settlement funds and other settlement benefits, and explains why the proposed settlement is fair, reasonable, and adequate and should be approved.

## BACKGROUND[1]

## I.      NOTICE PROCESS AND RESULTS

Pursuant to the Court-approved notice process, notice was sent initially to a total of 40,018 settlement class members by electronic mail and, if email addresses were not valid, by first-class mail with a postage-prepaid return envelope.  Declaration of

---

[1]      Plaintiffs described the background of the litigation in their motion for preliminary settlement approval at 3-6, ECF Dkt. No. 253, and incorporate that description herein by reference.

Stephen L. Donaldson, ¶¶ 4-10.  The settlement administrator also followed up on bad addresses and resent notice to updated addresses.  *Id*.  Additionally, after a Prime supervisor sent out an inaccurate Qualcomm message to all of its current drivers stating that the email with the class notice was a scam, this Court ordered the following additional notice in response to Plaintiffs' emergency motion for corrective notice:

- A Qualcomm message from Defendant to all current drivers confirming that the settlement notice was legitimate and directing individuals to the settlement website for more information and to file a claim;

- A similar message to be posted on numerous Prime driver Facebook groups; and

- The sending of notice by first-class mail to all class members (with an official letter from Prime confirming the authenticity of the settlement notice).

Dkt. No. 271.  This resulted in a second notice being sent by first-class mail to the 35,945 class members who had originally received notice only by email.  Donaldson Decl. ¶ 7. A reminder was sent approximately halfway through the claim period to individuals who had not yet responded to the notice.  Donaldson Decl. ¶ 8.  The reminder was sent by email to those with valid email addresses and by postcard via first-class mail for everyone else.  Id.

A settlement website, www.PrimeTruckingSettlement.com, was created by the settlement administrator, which contained copies of the notice and claim form in English and Spanish, a claim form that could be submitted online using an electronic signature, other important Court documents, and contact information for the settlement administrator.  As of December 29, 2020, the website had received 25,106 unique visitors and 97,453 pageviews.  Donaldson Decl. ¶¶ 11-12.

Overall, notice reached 37,230 out of the 40,018 class members (either by electronic mail or by first-class mail or both).  Donaldson Decl. ¶¶ 5-10.  Accordingly, less than 7% (2,788) of class members did not receive the notice sent to them by electronic mail or first-class mail.  Moreover, many class members received notice by both electronic mail and first-class mail.  Additionally, even for those individuals who did not receive notice directly, they may have received notice through the Facebook group messages that were posted on numerous Facebook groups with thousands of members.  Schwab Aff. ¶¶ 2-3.

As of the filing of this motion, the results of the notice process are as follows:

| Category | Number |
|---|---:|
| Valid Claim Forms | 14,689 |
| Claim Forms Still Being Processed | 2,073 |
| Requests for Exclusion | 54 |
| Objections | 1 |

Schwab Aff. ¶ 4.

## II.   ADDITIONAL NOTICE AND CLAIM PROCESS FOR NEWLY DISCOVERED D SEAT ORIENTATION CLASS MEMBERS

As explained in more detail in Plaintiffs' Assented-To Motion for Supplemental Notice to Certain Individuals in Settlement Class and for Preliminary Settlement Approval for New Orientation Group, filed today, Defendant recently informed Plaintiffs' counsel that they had discovered 5,994 who are part of the orientation class but for whom Defendants inadvertently did not originally provide D seat orientation

data.  Out of those 5,994 individuals, 4,752 individuals already received notice and an

opportunity to participate in the settlement (because they were part of the class as to

one or more of the other claims).  To date, 1,995  of the 4,752 individuals submitted

claim forms and are participating in the settlement.  They will receive shares as part of

the orientation fund based on the newly discovered information about their attendance

at D seat orientation.  Five individuals from this group have submitted requests for

exclusion.  2,752 of the 4,752 individuals did not originally submit claim forms or

request exclusion.  And 1,242 of the 5,994 newly discovered orientation class members

have not yet received any notice about the settlement.

In Plaintiffs' Assented-To Motion for Supplemental Notice to Certain Individuals

in Settlement Class and for Preliminary Settlement Approval for New Orientation

Group, Plaintiffs request:  (1) an additional round of notice to be sent (with another

opportunity to claim) to the approximately 2,752 individuals who received notice but

were later determined to be part of the orientation class and therefore received notices

with lower than accurate minimum amounts to give them another opportunity to claim

as part of this settlement; and (2) preliminary approval and notice to go out to 1,242

individuals who should have been included in the original class but were not (to receive

settlement shares, if they claim, proportional to what they would have received if they

were part of the original class).

III.    **SETTLEMENT TERMS AND PROPOSED DISTRIBUTION**

A.      **Distribution of monetary amounts**

The total settlement fund is up to $28,000,000, of which $14,000,000 is non-reversionary, meaning it will all be distributed, and $14,000,000 is to be distributed only to the extent that it is claimed.  Per the Settlement terms, the following allocation has been made among the various claims in the case:

- **Orientation fund**:  $7,000,0000 in non-reversionary funds to resolve the claims relating to unpaid orientation;

- **B/C seat driving fund**:  $3,500,000 in non-reversionary funds and $5,000,000 in claims-made funds to resolve the claims relating to B seat or C seat driving;

- **A seat driving fund**:  $3,500,000 in non-reversionary funds and  $5,000,000 in claims-made funds to resolve the claims relating to employee A seat (post final/upgrade orientation) driving; and

- **Independent contractor driving fund**:  $4,000,000 in claims-made funds to resolve the claims relating to independent contractor driving (i.e., driving while classified as an independent contractor).

Additionally, per the terms of the Settlement Agreement, the following distributions are proposed:

- up to 33% of the total settlement fund as attorneys' fees to Plaintiffs' counsel (up to $9,240,000 total);

- incentive awards of up to $50,000 for named plaintiff Dominic Oliveira and up to $25,000 for Rocky Haworth, the named plaintiff in the <u>Haworth</u> case, to be drawn equally ($25,000 each) from the orientation fund, the non-reversionary portion of the B/C seat driving fund, and the non-reversionary portion of the A seat driving fund;

- reasonable litigation costs, including costs of settlement administration, of up to $225,000, to be drawn half (up to $112,500) from the orientation fund, 25% (up to $56,250) from the non-reversionary portion of the B/C seat driving fund, and 25% (up to $56,250) from the non-reversionary portion of the A seat driving fund; and

- a fund of up to $200,000 to resolve disputes and pay reasonable late claims to be drawn 25% (up to $50,000) from the claims-made portion of the B/C seat driving fund, 25% (up to $50,000) from the non-reversionary portion of the A seat driving fund, and 50% (up to $100,000) from the independent contractor driving fund.

If the Court were to reduce any amounts proposed for attorneys' fees, incentive awards, litigation costs, or the dispute fund, those amounts would be distributed to class members to the extent that they come from non-reversionary funds and would revert to Defendant to the extent that they come from claims-made funds.

**B.     Settlement distribution based on valid claims submitted to date**

Plaintiffs set forth herein the amounts to be distributed to class members based on the current status of claims,[2] after calculation of $100 minimum payments for all class members, distribution of claimed funds, and redistribution of unclaimed funds from the non-reversionary funds.  There are two outstanding groups of potential claimants:  (1) there are 2,073 individuals whose claim forms are still being processed; and (2) per Plaintiffs' Assented-To Motion for Supplemental Notice to Certain Individuals in Settlement Class and for Preliminary Settlement Approval for New Orientation Group, Plaintiffs propose that approximately 2,752 individuals receive another opportunity to claim as part of the settlement.  There may be some additional valid claims through the deficiency resolution process and/or through the supplemental notice process which may slightly change the amounts set forth below. However, Plaintiffs expect that any changes to class members' monetary amounts will

---

[2]     The parties have agreed to include in the settlement distribution all individuals who submitted valid claims through January 4, 2021.  This includes approximately 93 claims that came in after the claim deadline.  Schwab Aff. ¶ 5.

be *de minimis*, because only a small fraction of the deficient claims are likely to be valid (the vast majority are, on their face, submitted by people who are not part of the class) and because it is likely that only a small percentage of the supplemental notice group will submit claims (as they have all already had and declined the opportunity to claim). Plaintiffs estimate that, at most, the additional claims that come in through these outstanding processes would result in a 5% downward adjustment of class members' settlement shares.  Schwab Aff. ¶¶ 6-8.

With that caveat, based on currently available information about valid claims, the amounts to class members are to be distributed as follows:

**$100 minimum payments ($50 for class members who participated in the** *Montgomery* **case settlement)**:  These amounts will be sent to all individuals who have not excluded themselves from the settlement.  The amounts come out of the non-reversionary funds, in proportion to class members' participation in the orientation claims, the B/C seat claims, and the A seat claims.  The total amount to be distributed in $100/$50 minimum payments is $3,951,500.  Schwab Aff. ¶ 9.

**Orientation fund**:  Individuals are to receive shares from the orientation fund based on an agreed-upon formula, proportional to class members' attendance at orientation and weighing orientation attendance based on the strength of the applicable claims.  Specifically, individuals have been given orientation shares as follows:  3 shares for attending D seat orientation in Missouri since 2012; 2 shares for attending D seat orientation outside of Missouri since March 2012; and 1 share for D seat orientation attended in Missouri before March 2012; 1 share for individuals who have worked as A

seat drivers or independent contractor drivers (and who therefore attended orientation in connection therewith); and 1.25 shares for individuals who have worked as both A seat drivers and independent contractor drivers.[3]

After redistribution of unclaimed funds, based on the total valid claim forms submitted to date, the total amount being distributed to claiming class members from the orientation fund (other than amounts from $100 minimums) is $2,282,504.  The amount class members will receive per each orientation share is $61.27.  On average, claiming class members are receiving $155.39 for their orientation claims.  This is a reasonable amount per share and on average.  These claims relate to non-payment of minimum wage for orientation time.  At $7.25 per hour, each orientation share compensates individuals for approximately 8.5 hours of unpaid orientation time.  On average, class members are receiving compensation equal to minimum wage for approximately 21.5 hours of orientation time.  These amounts are reasonable compensation for the orientation claims.  Schwab Aff. ¶ 11.

**B and C seat driving funds**:  Individuals' shares from the B and C seat driving funds shall be distributed proportional to each individual's total number of weeks worked as a B and/or C seat driver multiplied by the number of miles driven as a B and/or C seat driver and divided by gross earnings while employed as a B and/or C

---

[3]     The relative shares are based on Plaintiffs' counsel's reasonable assessment of the relative strengths and risks of the orientation claims.  D seat orientation was longer than A seat/independent contractor orientation and was totally unpaid; Missouri claims since March 2012 could be brought under Missouri law, which has a higher minimum wage than the FLSA for some of the applicable years and for which Plaintiffs could seek Rule 23 class certification; and the pre-March 2012 unpaid orientation claims are Missouri common law claims only.  Schwab Aff. ¶ 10.

seat driver.  This formula takes into account length of employment as a B and/or C seat driver, miles driven/hours worked, and wages earned.  Schwab Aff. ¶ 12.

After redistribution of unclaimed funds, based on the total valid claim forms to date, the total amount being distributed to claiming class members from the B and C seat driving funds is $2,571,930.  On average, class members are receiving $245.60 for just their B and C seat driving claims (not including $100 minimum payments).  Class members are receiving an average of approximately $12 per week for these claims.  In light of the fact that drivers were compensated for B/C seat driving and many weeks they were compensated in excess of the minimum wage, and in light of the fact that individuals often only worked as B/C seat drivers for a short period of time, the amounts afforded to class member from the B/C seat funds is reasonable.  Schwab Aff. ¶ 13.

**A seat driving funds**:  Individuals' shares from the A seat driving funds shall be distributed proportional to each individual's total number of weeks worked as an A seat employee driver multiplied by the number of miles driven as an A seat driver and divided by gross earnings while employed as an A seat driver.  This formula takes into account length of employment as an A seat driver, miles driven/hours worked, and wages earned.  Schwab Aff. ¶ 14.

After redistribution of unclaimed funds, based on the total valid claim forms to date, the total amount being distributed to claiming class members from the A seat driving funds is $3,403,624.61.  On average, class members are receiving $512.52 for their A seat driving claims (not including $100 minimum payments).  In light of the fact

11

that drivers were compensated for A seat driving and many weeks they were compensated in excess of the minimum wage, the amounts afforded to class member from the A seat funds is reasonable.  Schwab Aff. ¶ 15.

**Independent contractor driving fund**:  Individuals' shares from the independent contractor driving fund shall be distributed proportional to each individual's total number of weeks worked as an independent contractor driver multiplied by the number of miles driven as an independent contractor driver and divided by 65% of gross earnings while employed as an independent contractor driver.  This formula takes into account length of employment as an independent contractor driver, miles driven/hours worked, wages earned, and allegedly unlawful deductions taken from pay.  Schwab Aff. ¶ 16.

Based on the total valid claim forms to date, the total amount being distributed to claiming class members from the independent contractor driving fund is $1,200,847.51. On average, class members are receiving $164.18 for their independent contractor driving claims (not including $100 minimum payments).  Independent contractor drivers often earned higher rates of pay than employee drivers, meaning that they would have received at least minimum wage for all hours worked more frequently than A seat drivers.  Additionally, there were additional legal hurdles for this claim, namely proving that the drivers had been misclassified as independent contractors (using the FLSA's multi-factor test for employee classification).  In light of these issues, the amount of the settlement is reasonable from the independent contractor fund.  Schwab Aff. ¶ 17.

**Total settlement funds**:  Defendant agreed to pay up to $28,000,000 in settlement of this case.  In light of the significant portion of the settlement funds that have been claimed by the class members, assuming the Court finally approves the settlement, including the allocations to the class, the requested attorneys' fees, incentive awards, and settlement administration costs, Defendant will be paying more than $22,500,000 out of this total amount.  Schwab Aff. ¶ 18.

Of the $18,460,000 in settlement funds available to the class, a substantial portion has been claimed by the class members.  Based on the total valid claim forms to date, the total amount of funds to be distributed to class members (from all of the categories discussed above) is $13,410,406.13.   This means that 73% of the funds available for the class are being allocated.  Schwab Aff. ¶ 19.

Moreover, the funds being received by class members are significant.  No claiming class member is receiving less than $100 (except for a handful of class members who also received settlement funds from the *Montgomery* settlement and therefore are receiving 50% shares from this settlement per the parties' agreement).  The average total amount to be distributed to claiming class members is $742.70.  9,268 out of the 14,689 claiming class members are receiving over $500, and 2,493 claiming class members are receiving over $1,000.  587 claiming class members are receiving over $2,000.  Schwab Aff. ¶ 20.  This is significant recovery for minimum wage claims (which seek to recover only $7.25 per unpaid hour in single damages).

C.      **Non-monetary relief**

In addition to these monetary amounts, members of the class/collective are receiving significant non-monetary relief.  Specifically, Prime has agreed to a release of claims that it alleges that employee drivers owe to Prime and has agreed not to seek those disputed monies from the drivers in post-employment collection efforts (including both internal collection efforts, wage deductions, and collection efforts by third-party collection companies).[4]  Prime has agreed to discontinue these collections as to all monies that Prime asserts are owed to it by employee drivers in the class/collective, regardless of whether or not they submit claim forms to participate in the settlement.  The total number of class members who will be affected by this relief (*i.e.*, the total number of class members who have not worked as independent contractor drivers and are therefore automatically entitled to this relief regardless of whether they submit claim forms) is 22,115.  Schwab Aff. ¶ 21.

Prime has also agreed to this relief – a release of monies that it asserts are owed — as to independent contractor drivers who have submitted valid claim forms.  The total number of independent contractor drivers who have claimed as part of this settlement) is 7,314.[5]  Schwab Aff. ¶ 22.

---

[4]      To be clear, Plaintiffs dispute Prime's entitlement to these monies in the first place and the validity of any collection efforts, and they also dispute the amount of any monies owed.

[5]      The parties' Settlement Agreement provided that this release of monies as to independent contractor drivers was contingent upon the independent contractor drivers not having destroyed, damaged, or stolen Prime's property.  The parties developed a detailed process for dealing with such issues.  However, Prime has not challenged the release as to any independent contractor driver who submitted a claim form through December 6, 2020.  It has until January 12, 2021 to invoke the process for the group of individuals whose claim forms were provided on December 29, 2020 (approximately 1,530 claims), should it choose to do so.  Schwab Aff. ¶ 23.

Moreover, for all individuals for whom Prime has agreed to release entitlement to monies (described above), Prime has also agreed to the following upon final approval of the settlement:

- Prime will use its best efforts to request that the national credit reporting agencies (Experian, Equifax and TransUnion delete any reporting of the trade line(s) with respect to the drivers' accounts with Prime in connection with the purported debts released;

- If a driver requests by letter to HireRight that records of a default to Prime and/or related entities be corrected in accordance with the release of Prime's entitlement to monies, and to the fullest extent permitted by law, Prime agrees to provide a timely letter to HireRight with a copy to the requesting driver that any defaults owing to Prime and/or related entities have been rescinded by mutual agreement; and

- Prime and related entities shall give no new or additional negative references to any driver for having allegedly defaulted on any amounts released.

The release of provides significant benefit to 29,429 class members, because they no longer have to make payments on any such disputed amounts and will no longer be subject to collection efforts and/or negative credit reporting relating to the same. Schwab Aff. ¶¶ 21-22.  The additional relief to which Prime has agreed, described above, allows class members to improve their credit ratings and removes impediments to future job opportunities in the trucking industry.  The potential benefits of this non-monetary relief are significant.

**D.      Schedule for payments**

Settlement payments shall be made by check within thirty days after final approval of the settlement (including exhaustion of appeals, if any).  In other words, assuming that the Court approves the settlement soon and there is no appeal, payments are expected to issue to class members in approximately mid-March 2021.  Individuals

shall have 180 days to deposit or cash checks from the settlement.  After the expiration

of the checks, the Settlement Administrator shall deliver any uncashed or uncollected

but claimed funds to the appropriate state Unclaimed Property Division. Reversionary

funds not allocated to claiming Class Members shall be returned to Defendant.

      E.      **Releases of claims.**

As part of the settlement (and subject to its approval by the Courts), Dominic

Oliveira, Rocky Haworth, and Defendant will execute general, mutual releases in favor

of each other. All class and collective members shall release state and federal unpaid

wage claims, contract and quasi-contract claims, and any other claims related to unpaid

wages or compensation that were or could have been brought in the *Oliveira* and/or

*Haworth* cases to the fullest extent allowed by law. All persons who opt out of the

settlement will not release any claims. The notice to class/collective members informs

them that, unless they opt out, they are subject to a release of state and federal unpaid

wage claims, contract and quasi-contract claims, and any other claims related to unpaid

wages or compensation that were or could have been brought in the *Oliveira* and/or

*Haworth* cases to the fullest extent allowed by law.  The notice also separately informs

class/collective members that individuals who opt out will not be bound by the release.

As part of the notice and claim form, collective/class members are reminded again of

their release of claims.  As to those who receive only the $100 minimum payment,

checks issued pursuant to this settlement agreement will further contain the language of

this release.

ARGUMENT

## I.     THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE.

### A.     The Court should certify the proposed settlement class/collective pursuant to Federal Rule of Civil Procedure 23(b)(3) and 29 U.S.C. § 216(b).

For settlement purposes, and as required by Rule 23(e), the proposed settlement class/collective meets the requirements of Rule 23(a) and Rule 23(b)(3) for certification. Plaintiffs incorporate by reference their motion for class and collective action certification and reply brief in support of the motion, ECF Dkt. Nos. 198, 199, 216, which explain in detail why the proposed class/collective meets the requirements for certification.  Significantly, the settlement class/collective is substantially similar to the class and collective for which Plaintiffs originally sought certification.  Specifically, Plaintiffs sought FLSA collective certification of the following collective:  "All individuals who have attended training to become truck drivers for Prime and/or have driven for Prime either as employee drivers or as independent contractor drivers who have leased their trucks through Prime at any time since October 2, 2012."  ECF Dkt. No. 198 at 1.  They sought Rule 23 certification of the following class:  "All individuals who have attended training in Missouri to become truck drivers for Prime at any time since March 4, 2010."  Id.

The individuals in the proposed class/collective are similarly situated workers who have suffered the same alleged violation of their wage rights, namely the failure to pay workers at least minimum wage for all hours worked.  Moreover, the class is numerous, comprised of over 40,000 individuals.  Notably, this Court has already

granted class and collective certification on nearly identical claims.  In <u>Montoya v. CRST Expedited, Inc.</u>, the Court granted class and collective certification on claims for unpaid orientation and failure to pay truck drivers at least minimum wage for driving time (because of the mileage-based pay system, allegedly unlawful deductions from wages, and failure to compensate drivers for time in the sleeper berth in excess of eight hours per day).  311 F. Supp. 3d 411 (D. Mass. 2018).  Also, significantly, the <u>Haworth</u> court has already granted conditional FLSA certification for some of the claims in this case, holding that individuals who had driven for Prime as B and C seat drivers were similarly situated with respect to their claims that they were not properly compensated for all hours worked under the FLSA.  <u>Haworth v. New Prime, Inc.</u>, 448 F. Supp. 3d 1060 (W.D. Mo. 2020).

This Court and other courts in this District have also granted class or collective certification in numerous unpaid wages claims on behalf of truck drivers who had been classified as independent contractors.  <u>See, e.g.</u>, <u>Ouadani v. Dynamex Operations E., LLC</u>, No. CV 16-12036-PBS, 2019 WL 4384061, at *7 (D. Mass. Sept. 13, 2019) (granting class certification on delivery drivers' claims for independent contractor misclassification and unpaid wages, because the  central question is "[w]hether or not the . . . Drivers were properly classified as independent contractors rather than employees," and Plaintiffs' evidence about common policies and practices suffices to ensure that this determination may be made on a classwide basis); <u>Romero v. Clean Harbors Surface Rentals USA, Inc.</u>, 368 F. Supp. 3d 152, 156 (D. Mass. 2019) (granting FLSA classification based on the plaintiffs' allegations that: "Clean Harbors directed his

rate of pay; he reported directly to Clean Harbors, which coordinated his work and set his schedule; Clean Harbors dictated his work locations; he was required to follow Clean Harbors' policies and procedures; and Clean Harbors prohibited him from working for other employers or subcontracting his work for Clean Harbors"); DaSilva v. Border Transfer of MA, Inc., 296 F. Supp. 3d 389, 400 (D. Mass. 2017) ("Examining the standard terms [of the contract] to determine the extent of Border Transfer's contractual control is an exercise that appears to lead to common answers."); Vargas v. Spirit Delivery & Distribution Services, Inc., 245 F. Supp. 3d 268, 282 (D. Mass. 2017) (common issues predominated in independent contractor misclassification claim on behalf of delivery drivers, where "answers to [] inquiries [about liability] should be readily ascertainable through a common source—Spirit's corporate records").

For the reasons set forth in Plaintiffs' motion for class certification and reply brief in support of the motion, and as held in the cases cited above, this case is appropriately certified as a class and collective action for settlement purposes.

**B. The notice process was fair, reasonable, and adequate.**

The notice process was fair, reasonable, and adequate, as notice was sent by email and/or first-class mail, with many class members receiving notice by both email and mail, and with a reminder notice. Class members were also able to view the settlement terms on the settlement website, and they were able to submit claim forms electronically or by mail, fax, or email. This notice and method for submission of claim forms was unquestionably reasonable and the best practicable, particularly for a

population of truck drivers who are often away from home but usually have frequent

access to email.

Courts routinely approve notice dissemination plans similar to this one. See

Romero v. Clean Harbors Surface Rentals USA, Inc., 368 F. Supp. 3d 152, 163 (D. Mass.

2019) ("[T]he Court agrees with Romero that email notice is appropriate in this case

because it is likely to be more effective than alternative methods."); Graham v. Hall's S.

Kitchens, LLC, No. 2:18-CV-02621-RMG, 2018 WL 6177971, at *2 (D.S.C. Nov. 27, 2018)

("[T]he Court finds that notice via email is appropriate in today's mobile society."); see

also In re Solodyn (Minocycline Hydrochloride) Antitrust Litig., 2017 WL 5710424, at *1

(D. Mass. Nov. 27, 2017) (approving notice to individual class members by first-class

mail plus posting notice on settlement website); In re Asacol Antitrust Litig., 2017 WL

4118967, at *3-4 (D. Mass. Sept. 14, 2017) (same).

The notice reached more than 93% of all class members by email and/or first-

class mail, which is well within the undeliverable rate that courts have deemed

acceptable. See, e.g., Ebner v. Merchants & Med. Credit Corp., No. CV 14-06882, 2017

WL 1079966, at *4 (E.D. Pa. Mar. 22, 2017) (notice satisfied Rule 23 where there was "a

91.8 percent penetration rate"); Bowman v. Art Van Furniture, Inc., No. 17-11630, 2018

WL 6445389, at *3 (E.D. Mich. Dec. 10, 2018) (same, where "[t]he Notice reached over

90% of the class"); see also Brown v. Colegio de Abogados de Puerto Rico (D.P.R. Feb.

28, 2011) ("[T]he fact that around 9.5% of the Class Action Notices have been returned

as undeliverable is not unexpected and does not warrant extending the opt-out

deadline.  In fact, larger percentages of undeliverable notices have resulted

in notice procedures being approved.").  Moreover, many of those individuals may have received notice through another source, such as the Facebook groups on which a message from Prime directing drivers to the settlement website was posted and/or visiting the settlement website directly.

> **C.** **The settlement allocation formula is fair, reasonable, and adequate.**

Plaintiffs' proposed allocation formula is fair, reasonable, and adequate in that it takes into account each individual's potential damages from the case and allocates the settlement monies accordingly.  Courts routinely hold that such formulas are fair, reasonable, and adequate.  Indeed, a distribution formula that reimburses class members based on the type and extent of their injuries is presumptively reasonable. See, e.g., Sullivan v. DB Investments, Inc., 667 F.3d 273, 328 (3d Cir. 2011) ("Courts generally consider plans of allocation that reimburse class members based on the type and extent of their injuries to be reasonable") (citations omitted); Walsh v. Popular, Inc., 839 F. Supp. 2d 476, 482 (D.P.R. 2012) (approving methodology for calculating shares from class settlement based on "each class member's losses relative to those of the class as a whole"); Hochstadt v. Bos. Sci. Corp., 708 F. Supp. 2d 95, 110 (D. Mass. 2010) (holding that plan of allocation was reasonable because it was based on class members' losses); In re Omnivision Technologies, Inc., 559 F. Supp. 2d 1036, 1045 (N.D. Cal. 2008) ("It is reasonable to allocate the settlement funds to class members based on the extent of their injuries"); In re Citric Acid Antitrust Litigation, 145 F. Supp. 2d 1152, 1154 (N.D. Cal. 2001) (allocation plan that "reimburses class members based on the type and extent of their injuries is generally reasonable").

21

As discussed above, this settlement is providing significant monetary relief to a large number of individuals.  To date, there are 14,689 individuals who have submitted valid claims to participate in the settlement.  The total amount to be distributed to class members (including $100 minimum payments and amounts to claiming class members) is $13,410,406.13, which constitutes 73% of the potential available settlement funds.  Claiming class members are receiving an average of almost $750 from the settlement with thousands of class members receiving over $1,000 from the settlement.

Moreover, as discussed in more detail in the Background, Section III.A, *supra*, the recovery for class members is tied to their claims.  Class members are receiving compensation for unpaid orientation—with amounts based on how much orientation they attended and the relative strength of their claims.  Class members are also receiving additional amounts based on weeks worked and miles driven as B/C seat trainee drivers, A seat employee drivers, and independent contractor drivers.

In addition, 29,429 class members are receiving non-monetary relief which will provide them with significant benefits, including improved credit, potentially greater access to employment opportunities in the trucking industry, etc.  It is well settled that "injunctive relief is properly considered as part of a court's analysis of whether a settlement is fair, reasonable, and adequate."  Swinton v. SquareTrade, Inc., 454 F. Supp. 3d 848, 862 (S.D. Iowa 2020) (collecting cases).  Here, the fairness of the settlement is augmented by the non-monetary relief.  Significantly, in issuing an injunction last year against another trucking company engaging in similar conduct, this Court observed: "Affidavits by former drivers discuss how their tuition debt has negatively affected

22

their credit scores and ability to secure loans and how CRST's enforcement of the non-competition clause pending repayment of the debt has prevented them from obtaining employment. These harms to class members are immediate and ongoing and carry particular weight during the present period of national economic strain." Montoya v. CRST Expedited, Inc., No. CV 16-10095-PBS, 2020 WL 2850235, at *1 (D. Mass. June 2, 2020). The Court went on to hold that, "to the extent CRST's debt collection practices hinder class members' efforts to obtain alternate employment within the industry, the public has a strong interest in facilitating the full employment of trained truck drivers during the present public health crisis." Id. As in CRST, it provides substantial benefit for drivers to be relieved of monetary repayment obligations to Prime, to have their credit improved, and potentially to have access to more jobs in the trucking industry, all of which are effectuated by the non-monetary relief in this settlement. This is another reason that the settlement is fair, reasonable, and adequate and should be approved.

**D.      The one objection does not warrant non-approval of the settlement.**

One *pro se* objection has been filed. The objector stated that her reason for objecting was that "I think I deserve more money." Objection, ECF Dkt. No. 274. She went on to explain that: (1) she was terminated without any reason or explanation; and (2) after she was terminated, she was billed $4,774.50, and "there is difficulties sometimes for Truck Drivers to be hired to drive for trucking companies if they owe money to other trucking companies." Id. She further stated that she did not intend to appear at the final fairness hearing. ECF Dkt. No. 273 at 2.

For several reasons, the Court should approve the settlement despite this objection, and in light of the objection, since it does provide the Court with an opportunity to evaluate the relief afforded to the Class.  First, substantively, the objection does not actually raise issues with this settlement or the monetary relief paid to the Class members, since the objection applies to "only to the objector."  See Fed. R. Civ. P. 23(e)(5)(A).  The objector complains about being terminated, in September 2016, without a reason.  See ECF Dkt. Nos. 273 and 274.  However, this case does not purport to settle potential claims relating to wrongful terminations, only wage claims, and thus the objector's rights to pursue that potential wrongful termination claim are not affected by the settlement, and are the same as they existed in September 2016, when she was terminated.  Second, the objector notes that she was billed $4,774.50 after her termination and that such debts can make it difficult to get another job.  Significantly, this settlement does afford the objector relief from this debt and from the potential obstacle to being hired by another trucking company.  As discussed in the Background section, *supra*, Prime has agreed to release entitlement to monies for employee drivers as part of this settlement, and that includes a release of the $4,774.50 for this objector. Schwab Aff. ¶ 24.  Moreover, the other non-monetary relief relating to Prime agreeing to correct information about a default to Prime and agreeing not to give negative employment references resolves the concern of the objector about the difficulties in being "hired to drive for trucking companies if they owe money to other trucking companies."  ECF Dkt. No. 274.

Third, the amount the objector is receiving from the settlement is reasonable, as it is tied to her claims in this case—explicitly those relating to attending unpaid orientation—and seeking minimum wage for time attending that orientation.  While the settlement does not include amounts for the objector's alleged wrongful termination, again, the objector retains whatever rights to bring such claims as she originally had, as this settlement does not preclude or release such claims.  For the reasons set forth in Section I.C, *supra*, the amounts afforded to class members are fair, reasonable, and adequate and tied to their claims in this litigation.

Finally, only one objection was received out of a class of over 40,000 individuals, which further weighs in favor of approval.  See, e.g., In re Prudential Ins. Co. of Am. SGLI/VGLI Contract Litig., No. 3:10-CV-30163-MAP, 2014 WL 6968424, at *4 (D. Mass. Dec. 9, 2014) (overruling objections from eleven out of 67,027 class members, "which represent the personal views of a *de minimis* number of Settlement Class Members"); Cullen v. Whitman Med. Corp., 197 F.R.D. 136, 144 (E.D. Pa. 2000) ("[T]he reaction of the class to the proposed settlement was overwhelmingly positive. Out of over 5,250 persons who received notice of the settlement, . . . there was only one objector.  His objection related to his desire for a higher award because of severe hardship allegedly experienced that he attributed to defendant."; settlement approved).

E. **The objector's "Motion to Appeal" and "Request for Waiver of Mandatory Fee Reduction" should be denied.**

In addition to her objection, the *pro se* objector also filed a "Motion to Appeal" at Docket No. 274, which states that "My reason why I'm appeal or objecting to the minimum settlement payment … for myself if the Court approves the Class Action Settlement on January 13, 2021, is I think that I deserve more money."  Although this "Motion to Appeal " appears to be part of her objection, the objector has also filed a "Request for Waiver of Mandatory Fee Reduction" which has been docketed Docket No. 275.  In this filing, the objector states she is "appealing because I would appreciate receiving more money from the court cases."

For the reasons set forth above, the Court should deny the "Motion to Appeal" (Dkt. 275) to the extent the Court construes it as part of the objection to the settlement. To the extent that the Court construes the Motion to Appeal to seek some other relief pursuant to Fed. R. Civ. P. 23(e) or (f), or an appeal of the final order and judgment approving the settlement, that relief is premature since there has not been a final order or judgment approving the settlement.[6]

F. **All elements for class settlement approval have been met here.**

It is well-established that courts prefer settlements of lawsuits over continued litigation.  See, e.g., In re: Google Inc. Cookie Placement Consumer Privacy Litig., 934

---

[6]   To the extent that the Court construes the "Motion to Appeal" and the "Request for Waiver of Mandatory Fee Reduction" as a request to proceed *in forma pauperis* on an appeal pursuant to Federal Rule of Appellate Procedure 24(a)(1), and 28 U.S.C. § 1915, the Court should deny the Motion pursuant to Fed. R. App. P. 24(a)(2) and (4) and  28 U.S.C. § 1915(a)(1) and (3) again because any appeal and related motion to proceed *in forma pauperis* are premature.

F.3d 316, 326 (3d Cir. 2019) ("[W]e favor the parties reaching an amicable agreement and avoiding protracted litigation.").  "A settlement is presumed to be reasonable when it is achieved by arm's length negotiations conducted by experienced counsel."  <u>Nat'l Ass'n of Deaf</u>, 2020 WL 1495903, at *4.  Moreover, when the following "procedural guidelines have been followed," there is a "presumption that the settlement is within the range of reasonableness":  "'(1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected.'"  <u>In re M3 Power Razor System Marketing & Sales Practice Litig.</u>, 270 F.R.D. 45, 62-63 (D. Mass. 2010) (quoting <u>In re Lupron Mktg. and Sales Prac. Litig.</u>, 345 F. Supp. 2d 135, 137 (D. Mass. 2004)).

Each of these elements is satisfied here.  First, the proposed settlement resulted from extensive arms' length negotiations that occurred over the course of several months, and which included extensive data production and analysis and a full-day mediation and numerous follow-up conversations facilitated by an experienced mediator.[7]  Second, substantial litigation and discovery has taken place, as described in detail in the Background section of Plaintiffs' motion for preliminary settlement approval, ECF Dkt. No. 253, at 3-6.  Thus, all parties were familiar with the factual record underlying the claims in this case.  Third, the parties' attorneys are experienced in this type of litigation, as described extensively in Plaintiffs' motion for preliminary

---

[7]       The parties in <u>Haworth</u> also engaged in another full-day mediation with a different experienced mediator, although that did not result in settlement.

settlement approval, id. at 23-25, and Plaintiffs' Preliminary Petition for Attorneys' Fees and Costs, ECF Dkt. No. 272, both of which Plaintiffs incorporate herein by reference.

Fourth, "only a small fraction of the class objected." Indeed, there has been one objection in a class of over 40,000. As discussed in Section I.D, *supra*, this objection does not raise issues that render this settlement anything other than fair, reasonable, and adequate. Moreover, in light of the one objector comprising approximately 0.0025% of the class, this factor is more than satisfied.

For the reasons set forth above, the settlement is fair, reasonable, and adequate, and should be approved.

## II.   THE PROPOSED INCENTIVE AWARDS ARE FAIR AND REASONABLE.

Plaintiffs request that the Court approve an incentive award of $50,000 for named plaintiff Dominic Oliveira and $25,000 for Rocky Haworth, the named plaintiff in the Haworth case. These proposed incentive awards are fair and reasonable, given that it was the named plaintiffs who not only initiated this lawsuit on behalf of their coworkers, but who obtained this recovery. The named plaintiffs were vital to the prosecution of this matter.

As courts in this District have recognized, "[i]ncentive awards are an appropriate means for encouraging individuals to undertake the responsibility of representative lawsuits." Carlson v. Target Enterprise, Inc., 447 F. Supp. 3d 1, 5 (D. Mass. 2020). Indeed, "[c]ourts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." Id. (internal quotation marks omitted). The factors courts consider in

analyzing the reasonableness of an incentive award are: "1) the risk to the class representative in commencing suit, both financial and otherwise; 2) the notoriety and personal difficulties encountered by the class representative; 3) the amount of time and effort spent by the class representative; 4) the duration of the litigation and; 5) the personal benefit (or lack thereof) enjoyed by the class representative as a result of the litigation." Id. (quoting Swack v. Credit Suisse First Bos., LLC, No. CIV A 02-11943-DPW, 2006 WL 2987053, at *4 (D. Mass. Oct. 4, 2006)).

All of these factors support the requested incentive awards. The work Mr. Oliveira put into this case is detailed extensively in the attached Affidavit of Dominic Oliveira and Affidavit of Andrew Schmidt, Esq. First, Mr. Oliveira endured many risks in beginning this lawsuit, as evidenced by the fact that he was the first driver to challenge Prime's pay practices on this scale. He has continued to put himself at risk of potential retaliation by others in the trucking industry (and believes he has suffered such retaliation), as he has been the public face of this lawsuit for five years. Oliveira Aff. ¶¶ 2-5, 26-29.

Second, he has received notoriety for bringing the lawsuit—both good and bad. He has appeared on two radio shows and has been interviewed and featured in numerous newspaper and magazine articles. He has spent countless hours talking to other truck drivers (both in person, on the phone, and on social media), to inform them about this lawsuit and their rights relating to it. Oliveira Aff. ¶¶ 14-25.

Third, he has spent an unprecedented amount of time and effort on the case from the beginning through the present. He worked with the attorneys at the beginning of

the lawsuit, explaining the pay practices at Prime and educating them about the trucking industry.  During the litigation, he participated in discovery, including responding to written discovery and sitting for a full day deposition.  He kept in regular communication with the attorneys, receiving updates about the case and pending motions and also weighing in on strategy and negotiation decisions.  He has communicated with hundreds of drivers about the case, likely helping to achieve the high claim rate and ensuring that drivers knew about their rights in the case and the settlement.  Oliveira Aff. ¶¶ 6-15; Schmidt Aff. ¶¶ 4-9.

Mr. Oliveira also immediately brought to Plaintiffs' counsel's attention the inaccurate message that was sent to Prime drivers on Qualcomm, claiming that the settlement notice email was a phishing scam.  Oliveira Aff. ¶ 14.  Because of his quick action informing Plaintiffs' counsel about this issue, Plaintiffs were able to get the issue before the Court expeditiously in order to mitigate its negative impact on class members submitting claims.  Schwab Aff. ¶ 25; Schmidt Aff. ¶ 8.  Mr. Oliveira's role as spokesperson and champion for the rights of workers during this case's five-year history was invaluable.  Schmidt Aff. ¶p 4-9.

Fourth, as to duration, this litigation has been extensive.  Mr. Oliveira filed this case in March 2015, and he has seen this case through an appeal to the First Circuit, an appeal to the United States Supreme Court, and remand back to the District Court.

Fifth, as to personal benefit from the settlement, Mr. Oliveira is set to receive a monetary payment of $741.12 from the settlement (based on the current claim rate),

which is almost exactly the average to be paid out to claiming class members, though thousands will be getting significantly more than that.  Schwab Aff. ¶ 26.

The factors courts analyze in determining the reasonableness of a service award are also met as to Named Plaintiff Rocky Haworth.  His participation in the <u>Haworth</u> matter was absolutely vital to protecting the interests of the B and C seat drivers, and the Class as a whole.  Mr. Haworth put his personal reputation on the line, in Prime's home state of Missouri, by filing his claims.   At the time when Mr. Haworth stepped forward, Prime was threatening to sue him for amounts he allegedly owed Prime related to his training.  Mr. Haworth risked potential counterclaims from Prime when he stepped forward and pursued his rights under the Fair Labor Standards Act, and Missouri Minimum Wage Law.  Affidavit of Garrett M. Hodes, Esq., ¶¶ 2-7.

Additionally, Mr. Haworth spent considerable amounts of his personal time in the prosecution of these claims.  Not only did Mr.  Haworth also participate in written discovery, a full day deposition in Iowa,  an all-day mediation in Kansas City, Missouri, but his insight, and information, were critical in helping counsel reach a successful resolution in this matter.  Mr. Haworth spent substantial amount of time communicating with Plaintiffs' counsel about the facts in this case which were essential to the deposition of Prime's corporate representative and ultimately FLSA certification.  Mr. Haworth also submitted several Declarations throughout the course of the litigation which helped defeat Prime's attempts to send the case to arbitration and helped obtain certification.  Throughout the entirety of the litigation, and the settlement process (including at the Kansas City mediation, and at other times before and after), Mr.

Haworth displayed the utmost honor and integrity and dedication to the Class. Hodes Aff. ¶¶ 7-11. In addition, Mr. Haworth's personal benefit from the settlement (based on the current claim rate) will be a monetary payment of $324.58, which is quite a bit lower than the average payment. Schwab Aff. ¶ 26. This amount is well below the average amount to be paid out to claiming class members, also illustrating, like Mr. Oliveira, that Mr. Haworth's significant participation in this litigation served to benefit the interests of the class and not merely his own personal interests.

In addition to the fact that all of the factors typically considered by courts weigh in favor of substantial incentive awards here, there are at least two other reasons to approve the awards. First, the notice to class members informed them that Plaintiffs would seek Court approval for incentive awards of up to $50,000 for Dominic Oliveira and up to $25,000 for Rocky Haworth. No class member has objected to these incentive awards. Schwab Aff. ¶ 27.

Second, the incentive awards requested here are well within the range of those approved in other class actions and are less than 0.3% of the total monetary recovery available to the Class. See, e.g., In re Asacol Antitrust Litig., 2017 WL 11475275, at *4 (D. Mass. Dec. 7, 2017) (approving service awards of $100,000 each for five named plaintiffs); In re Flonase Antitrust Litig., 951 F. Supp. 2d at 751 (awarding incentive awards of $50,000 and $40,000); Brotherton v. Cleveland, 141 F. Supp. 2d 907, 914 (S.D. Ohio 2001) (awarding $50,000 incentive award to named plaintiff who "has been instrumental in bringing this lawsuit forward" and "has performed numerous tasks in association with this litigation"); McCoy v. Health Net, Inc., 569 F. Supp. 2d 448, 479–80

(D.N.J. 2008) (awarding $60,000 incentive awards to each named plaintiff where "the Class Representatives spent a significant amount of their own time . . . litigating these cases for the benefit of the absent members of the settlement class. . .").

In other wage and hour class actions in the trucking industry specifically, courts have awarded incentive awards in the range requested here.  In <u>Van Dusen v. Swift Transportation Co.</u>, the court awarded "Service Awards to Named Plaintiffs in the amount of $50,000 per Named Plaintiff as the reasonable value of the services provided by each of the Named Plaintiffs to the Class Members in litigating and resolving this Action."  D. Ariz. Civil Action No. 2:10-cv-00899, Dkt. No. 1158.  In <u>Browne v. P.A.M. Transport, Inc.</u>, the court has granted preliminary approval of the parties' proposed settlement, including $50,000 incentive awards for each of three named plaintiffs (for a total of $150,000).  W.D. Ark. Civil Action No. 5:16-cv-5366, Dkt. Nos. 279, 282.

The requested incentive awards here serve exactly the purposes for which they are intended—rewarding the named plaintiffs for their tireless advocacy on behalf of the class and recognizing the time they spent and the risks they took in undertaking that effort—and all factors considered by courts favor approval of the requested awards.  Plaintiffs respectfully request that the incentive awards be approved.

## III.    THE REQUESTED ATTORNEYS' FEES AWARD IS FAIR AND REASONABLE, AND SUPPORTED BY APPLICABLE PRECEDENT.

Plaintiffs have submitted a lengthy brief seeking an award of attorneys' fees of $9,240,000 and expenses of up to $225,000, including the costs of settlement administration.  See Pls.' Prelim. Pet. For Attys.' Fees and Costs, ECF Dkt. No. 272.  Plaintiffs incorporate that brief by reference.  Additionally, since the filing of the

preliminary fee petition on November 23, 2020, Plaintiffs' counsel have expended approximately 205 additional hours.  Accordingly, the lodestar multiplier has gone down from 3.8 to 3.64.  Schwab Aff. ¶¶ 28-29.  Plaintiffs' counsel expect that they will spend significant additional time in settlement administration as well.  For example, Plaintiffs' counsel expect to:  continue to communicate with the Settlement Administrator relating to the status of claims and payment; resolve potential issues about additional claims; perform settlement calculations; and communicate with class members, etc.  This work is expected to take substantial additional time.  Schwab Aff. ¶ 30.

One additional point bearing noting on Plaintiffs' requested fee award.  As set forth in more detail in Plaintiffs' Assented-To Motion for Supplemental Notice to Certain Individuals in Settlement Class and for Preliminary Settlement Approval for New Orientation Group, filed today, the parties seek approval of a settlement process to afford an opportunity for 1,242 additional individuals to receive notice and an opportunity to claim by the same method and for the same amounts as are to be awarded to class members in the original notice group.  Though the settlement for this additional group involves payments of additional monies by Prime, separate from the $28,000,000 settlement fund, and though the administration of the settlement will involve significant additional work, Schwab Aff. ¶ 31, Plaintiffs' counsel are not seeking additional attorneys' fees relating to the settlement for these 1,242 people.[8]

---

[8]     The parties have agreed that Plaintiffs' counsel will not seek any additional attorneys' fees or costs (other than the costs of the third-party settlement administrator) relating to the settlement for these additional individuals, as long as the settlement is finally approved for the new group without the need for any appeal or any significant litigation beyond seeking and obtaining settlement approval.  See

Accordingly, and for the reasons set forth in Plaintiffs' Preliminary Petition for Attorneys' Fees and Costs, Plaintiffs respectfully request that the Court approve Plaintiffs' request for attorneys' fees.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that this Court grant final approval of the settlement.  Specifically, Plaintiffs request that the Court issue the Final Settlement Approval Order and Judgment attached to this motion as Exhibit 1.

Respectfully submitted,

DOMINIC OLIVEIRA,
on behalf of himself
and all others similarly situated,

By their attorneys,

 */s/ Hillary Schwab*
Hillary Schwab (BBO #666029)
Brant Casavant (BBO #672614)
Rachel Smit (BBO #688294)
FAIR WORK, P.C.
192 South Street, Suite 450
Boston, MA 02111
Tel. (617) 607-3261
Fax. (617) 488-2261
hillary@fairworklaw.com
brant@fairworklaw.com
rachel@fairworklaw.com

---

Addendum to Settlement Agreement and Release of Claims, Exhibit 1 to Plaintiffs' Assented-To Motion for Supplemental Notice to Certain Individuals in Settlement Class and for Preliminary Settlement Approval for New Orientation Group, filed today.

Andrew Schmidt, Esq.
  Admitted *pro hac vice*
Andrew Schmidt, PLLC
97 India St.
Portland, ME 040101
Tel. (207) 619-0320
Fax. (207) 221-1029
Andy@MaineWorkerJustice.com


Virginia Stevens Crimmins, MO #53139
Admitted *pro hac vice*
Matthew R. Crimmins, MO #53138
Admitted *pro hac vice*
CRIMMINS LAW FIRM LLC
214 S. Spring Street
Independence, Missouri 64050
(816) 974-7220 Telephone
(855) 974-7020 Facsimile
m.crimmins@crimminslawfirm.com
v.crimmins@crimminslawfirm.com


Garrett M. Hodes, MO #50221
Admitted *pro hac vice*
900 Westport Road, 2nd Floor
HODES LAW FIRM, LLC
Kansas City, Missouri 64111
(816) 931-1718 Telephone
(816) 994-6276 Facsimile
garrett@hodeslawfirm.com


Dated:  January 6, 2021

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on January 6, 2021, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

 */s/ Hillary Schwab*
Hillary Schwab